DEMETRIO LATONI PECUNIA, demandante y apelado, *v.* ANDREA DE LOS SANTOS, demandada y apelante.

No. 6078.—*Sometido:* Enero 29, 1935. *Resuelto:* Marzo 13, 1936.

*Adrián Agosto,* abogado de la apelante; *B. Fernández García,* abogado del apelado.

EL JUEZ ASOCIADO SEÑOR HUTCHISON, emitió la opinión del tribunal.

Latoni inició el presente recurso para recobrar la suma de $1,900 que se alegaba constituía el saldo en descubierto de una hipoteca por la suma de $2,300, más $57 de intereses vencidos el 22 de abril de 1931, e intereses al 12 por ciento a partir de dicha fecha hasta su definitivo pago. Se contestó negando la demanda generalmente, y se adujo una defensa afirmativa en la siguiente forma:

"Que en el negocio de la hipoteca cuyo importe se le reclama por este pleito, el demandante arriba indicado ha intervenido siempre por su apoderado don Francisco Rivera Collazo; y que el mismo día 22 de mayo 1930 en que se efectuó el préstamo hipotecario objeto de esta acción, por ante el mismo notario . . . ., esta demandada le vendió al citado Francisco Rivera Collazo dos solares, por precio ambos de $1012.00, de los que tenía que descontar la suma de $300.00 importe de una hipoteca que pesaba sobre ellos a favor del propio Sr. Rivera Collazo, y el resto de dicha suma, después de descontadas algunas cantidades pequeñas importe de los gastos de la titulación, se quedó con ellos dicho Sr. Rivera Collazo con el fin de abonarlos a dicha hipoteca objeto de este caso.

"En virtud de lo que esta demandada a esta Hon. Corte:

"Suplica dicte sentencia declarando con lugar la demanda, pero sólo en cuanto a la cantidad de $800 poco más o menos que es lo que le queda restando dicha demandada al demandante y condenándole a dicho demandante a pagar las costas, gastos y honorarios del abogado de este caso."

Andrea de los Santos era una mujer analfabeta, como de 76 años de edad. El notario a quien acudió en solicitud de consejo había sido su abogado por espacio de varios años y ella tenía en él absoluta confianza. Él también había sido abogado de Latoni o de su agente y apoderado Rivera por algún tiempo. Representó a Latoni en la corte de distrito hasta el momento de radicarse el escrito de apelación en el presente caso. En la hipoteca de Latoni, Andrea de los Santos admitía haber recibido $2,300 con anterioridad al otorgamiento de la escritura. Ella había tramitado este préstamo con el fin de pagar una deuda que tenía pendiente con Martín Hernández y que se había calculado ascendía a $2,307.50. Sin embargo, Hernández reclamaba y materialmente recibió por lo menos $2,347.50 como importe de la deuda.

En la escritura de enajenación a Rivera se hizo constar igualmente que el saldo del precio de la compraventa, ascendente a unos $900, había sido recibido por la vendedora Andrea de los Santos, con anterioridad a la fecha del documento. Su relación de lo sucedido sustancialmente es: Que el préstamo de $2,300 fué tramitado con el objeto de hacer efectivos

tres pagarés a Hernández; que el mismo día ella le vendió a Rivera dos solares por $1,012; que éste tenía una hipoteca sobre los dos solares por la suma de $300 que ella pagó; que el saldo era o debió ser $712; que allí nadie le entregó ningún dinero a ella; que no recibió los $712; que sólo recibió de Rivera $17.50 en presencia del notario y del hijo de ella, Juan de los Santos; que se le informó que no se le entregaban los $712 porque tenían que acreditarse a la hipoteca; que Rivera le informó esto a ella, y no se había abonado nada a la hipoteca; que el mismo día ella hizo otro negocio con Rivera, y que el mismo día el notario le dijo en casa de ella y en presencia de Rivera que cuando él fué a entregar el dinero a Hernández éste se había negado a aceptarlo, porque según Hernández, faltaban $40; que por estas razones Hernández no había estado dispuesto a aceptar la suma ofrecídale o a firmar la escritura notarial porque faltaban $40; que Rivera entonces le prestó a ella el dinero y le tomó la firma en un documento; que el hijo de ella firmó a instancias suyas, por la suma de $40; que no sabe por qué si había un saldo de $700 Rivera tenía que prestarle $40; que desde que se otorgó la hipoteca hasta el día del juicio Rivera le había estado diciendo que los setecientos y pico de pesos habían sido abonados a la hipoteca; que como él siempre le pasaba los recibos por $23, la testigo le decía: ''Don Francisco, usted no ha abonado nada al dinero ese; vamos a arreglar con el blanco, con el amo de la hipoteca,'' pero que como ella no lo ha visto nunca ni sabe quién es, con quien arreglaba era con Don Francisco; que Rivera le decía que no se dejara decaer con los réditos, y ella le decía ''que del dinero que estaba a fondo que le bajara los réditos''; que ella quería que le bajaran los réditos del dinero que le sobraba de los dos solares que le vendió, y que cuando ella le decía eso él le contestaba que tenía que hacerlo de acuerdo con el acreedor hipotecario, Latoni, suegro de Rivera; que tenía que hacerlo para entonces rebajarle los intereses. Repreguntada declaró que tenía las contribuciones atrasadas; que no se recordaba de la suma

y que no la había pagado; que al efectuarse el negocio ella la pagó o autorizó el pago de la misma; que ella no las pagó del dinero recibido de Rivera; que no exigieron de ella el pago de tal suma como condición para efectuar el negocio; que él no le exigió nada de eso; que los $17 no daban para pagar las contribuciones; que cuando se hizo el negocio la habían demandado para ejecutar la hipoteca; que no recordaba si como resultado de ese pleito tuvo que pagar costas y gastos; que no recordaba si ese pleito fué lo que motivó también la transacción con Rivera; que al venderse los dos solares Rivera le pagó $17.50 y se quedó con el restante del dinero para abonar a la hipoteca; que ella no le exigió un recibo porque estaba Juan de los Santos, que es su hijo, y no le exigió recibo; que últimamente le han estado cobrando intereses por esta deuda, pasándole un recibo por $19; que no ha pagado ningún mes de esos intereses desde febrero para acá; que ella le ha mandado a Rivera $16; que no han ido a su casa a cobrarle esos intereses; que Rivera no ha mandado donde ella a cobrarle; que él le mandó una carta, pero que ella no le ha pagado a él porque él no le ha dado los intereses por los dos solares que le había vendido, y ella le pedía que arreglara y bajara los réditos para ella pagarle, y ahí fué donde no le pagó; que ella no sabe con cuánta cantidad se le quedó don Paco a ella, porque no sabe leer ni escribir.

La parte pertinente del testimonio de Rivera es al efecto de que había conocido a Andrea de los Santos durante unos ocho años; que en mayo de 1930 había hecho negocios con ella a nombre de su suegro, Latoni, a quien representa; que en marzo, 1930, ella vino donde él para negociar una hipoteca por $2,300 para pagarle a Martín Hernández; que él convino en hacer el negocio y le dió a ella los $2,300; que se otorgó una hipoteca en mayo 22, 1930; que la demandada recibió el dinero para pagarle a Hernández; que se le pagó a Hernández; que la escritura de hipoteca fué otorgada en la oficina del letrado del demandante y ante dicho abogado

como notario; que en enero, 1931, ella pagó $400 que él recibió para su principal; que no se otorgó documento alguno en relación con el abono de los $400; que Andrea de los Santos debía a Latoni un saldo de $1,900, más intereses vencidos, ninguna parte de los cuales había sido pagada; que al radicarse la demanda se debían tres plazos de intereses; que se debían intereses desde el mes de febrero a razón de $19 mensuales. En la repregunta, este testigo dijo: Que Andrea de los Santos le debía unos chavos; que él tuvo que poner un dinero exigido por Hernández; que le prestó a ella un dinero; que fueron $40 y pico más que le pidió; que un documento identificado por el testigo como un recibo por los intereses del dinero había sido escrito por él; que ella le adeudaba $48 más; que ella continuó debiéndole esa suma en mayo 22, que fué el día en que se otorgó la hipoteca por $2,300; que en dicho día él le prestó a ella $48; que el recibo mostrádole no era el recibo por los intereses de los $48; que él tuvo que pagar una póliza de seguro y unos centavos que ella le pidió ascendentes a $60 (que eso no es de los $48); que él no tiene el pagaré que ella le suscribió por los $48; que él no lo tenía en su poder, pero que ésa era una transacción distinta con Juan de los Santos, hijo de Andrea de los Santos; que él no sabe si ellos firmaron el mismo día en que se otorgó la hipoteca, si fué el mismo día u otro día; que no recordaba; que no lo trajo porque ése no es este caso; que ese día, Andrea de los Santos, ante el mismo notario, le vendió al testigo dos solares por $1,012 y centavos; que el referido día Andrea de los Santos recibió $2,300 de la hipoteca, más $1,012, o sea $3,312. El resto de su testimonio, como testigo del demandante, aparece en el siguiente extracto:

"El abogado de la demandada pregunta al testigo por qué tuvo entonces esa señora que cogerle a él (el testigo) $48 prestados.

"El demandante hace objeción a la pregunta porque es inmaterial e irrelevante en este caso: es una acción de Demetrio Latoni contra Andrea de los Santos y no tiene que ver una negociación particular de Francisco Rivera con Andrea de los Santos.

"El testigo contestando la pregunta dice: Que esta señora tenía una hipoteca de $300 con él. Cuando la señora solicitó hacer una nueva hipoteca con él (el testigo) él le dijo: 'Señora, usted no está en condiciones, como usted paga está muy mal; usted me tiene constituída una hipoteca también de trescientos dollars.' Que entonces ella le dijo: 'Bueno, don Francisco, cómpreme usted esos solares.' Entonces el testigo le dijo: 'Bueno, yo le voy a comprar esos dos solares.'

"Que era cobrándose él los $300; que no puede contestar esa pregunta de que cómo es que habiendo doña Andrea cogido los $2,300 y los $1,012 de la venta de los solares tuvo que pedirle al testigo $48 más prestados, porque hubo dos operaciones; ella le cogió de la primera $712 y centavos. Después le hizo la otra operación y el testigo no puede decir qué ella hizo con el dinero; que no se le ocurrió decirle a doña Andrea, que ella teniendo 700 y pico de pesos en sus bolsillos, ¿por qué necesitaba $48? ¿Por qué ella necesitaba hacer otra operación? Que es verdad que él le dió dicha cantidad a doña Andrea de los Santos porque él tiene los testigos que vieron que ella recibió el dinero; y que es muy fácil decir que el resto de la cantidad de $700 se los apropió el testigo como intereses usurarios al préstamo de $2,300, cuando el abogado de la demandada que le interroga no dió fe en el caso en que se hizo la operación y está creyendo lo que su cliente le dice; que no es verdad que él se quedara con esos cuartos de doña Andrea en los bolsillos y no se los entregara a ella, porque el abogado de la demandada no conoce al testigo, pero que lo cierto es, que ese mismo día ante el notario . . . hizo el testigo varios negocios con la demandada; uno en virtud del cual el testigo como apoderado del Sr. Latoni, que es suegro del testigo, le prestó a doña Andrea de los Santos los $2,300, cuya cantidad sirvió para pagarle a don Martín Hernández; y otra en la cual el testigo le compró a la demandada doña Andrea de los Santos dos solares en $1,012; y otro negocio en que el mismo día y ante el mismo notario y por un pagaré, la demandada Andrea de los Santos le pidió prestado al testigo $48; que el dinero en que le dió a la señora de los Santos los $1,012 fué en billetes de banco de los Estados Unidos; que el notario . . . estaba presente cuando eso, porque el testigo se los entregó al notario y el notario se los entregó a doña Andrea.

"El abogado de la demandada hace al testigo la siguiente pregunta: '¿Y por qué no se hizo constar en la escritura que usted los dió en el mismo acto?'

"Juez. El testigo no puede contestar eso.

"Continúa el testigo declarando a la demandada y dice: Que el dinero ese lo tenía en el banco y tenía en su casa y que no puede precisar ahora qué cantidad tenía en el banco y qué cantidad tenía en su casa, porque en los bancos hay veces que uno cierra con tres mil y al otro día tiene tres pesos; que su profesión es la de comerciante y que hoy vive de las pequeñas rentas que tiene, que las ha trabajado; que él y su suegro no se dedican a prestar dinero y que él representa a su suegro que es hombre de dinero y tiene muchas hipotecas colocadas en San Juan, siendo el testigo el que se las coloca; que no obstante eso su negocio no es ahora el de prestar dinero; que su negocio es vivir de lo que ha trabajado antes honradamente, para descansar ahora y llevar la vida un poco más tranquila. Solamente me dedico a atender a mis negocios que son casas, solares, dinero en hipoteca.

"El abogado del demandante vuelve a preguntar al testigo, el que contesta lo siguiente:

"Que no recuerda si además de los gastos de documentación y los 300 pesos que se le pagaron al testigo, la demandada señora de los Santos pagara las contribuciones vencidas sobre su finca ese mismo día."

Rafael Dechoudens, otro testigo del demandante, declara: Que el negocio fué una hipoteca que le hicieron Andrea de los Santos y su hijo Juan, a favor de Latoni, suegro de Rivera; que él presenció el negocio; que Andrea de los Santos tenía una hipoteca; que él firmó la escritura como testigo; y que en aquella misma ocasión ella le canceló una hipoteca a Hernández, y que a éste se le pagó con el dinero que prestaba Rivera, $2,300; que él vió el traspaso del dinero; que el testigo estaba bien enterado de los negocios de Rivera; que ese mismo día Andrea de los Santos hizo una venta a Rivera; que sabe que Andrea de los Santos no ha pagado los $2,300; que solamente el hijo, Juan, pagó algo; que ella canceló pagando $400, y que ella adeudaba un saldo de $1,900; que se abonaron los $400. En la repregunta declara: Que sabe que Andrea de los Santos no ha pagado al demandante porque Rivera la ha requerido distintas veces y que sabe esto porque él ha sido portador de cartas requiriéndola; que el testigo es muy amigo de Rivera; que él se dedica al

negocio de comisiones, de ventas y préstamos; que él no fué el agente en este negocio de Latoni y Andrea de los Santos; que fué un negocio directo entre ella y Rivera; que aquel día allí se hicieron varios negocios; que hubo una cancelación de Hernández a favor de Andrea de los Santos; hubo otro, una hipoteca, a favor de Demetrio Latoni por $2,300 que eran para pagarle a Hernández, y hubo otro, de una venta de dos solares a favor de Rivera para pagarle $300 que le debía, y recibir el resto en dinero; que esa fué la transacción; que el testigo cree que hubo otra transacción, de un pagaré por $48 que Rivera le prestó a Andrea de los Santos, pero que no lo recuerda muy bien.

Tomamos de los autos la siguiente versión de lo sucedido, conforme la misma fué hecha por el letrado del demandante, que actuó también como notario:

" . . . que conoce a Francisco Rivera Collazo, quien es su cliente, y también conoce a Andrea de los Santos hace muchos años, la que también ha sido cliente de él, así como a sus familiares; que el 22 de mayo de 1930 estos señores efectuaron un negocio de hipoteca por la suma de $2,300. Esta cantidad era para cancelar otra hipoteca que tenía ella constituída por ella y su hijo Juan a favor de Martín Hernández por una suma poquito mayor de $2,300.00, como consta de la documentación. Se hizo esta escritura pública en mi oficina. Vino ella, la firmó ante los testigos presenciales, y entonces a mí, como notario, se me confió la cantidad ésta para proceder a la cancelación de la hipoteca, y fuí al Seboruco, me parece que a las doce del día, entre doce y una, y estando Martín Hernández almorzando lo llamé y le dije: 'Vengo a cancelar la hipoteca de Andrea de los Santos.' Entonces dejó de almorzar y en la antesala leyó la escritura, la firmó y recibió el importe de la hipoteca.

"También sé de la otra transacción, de la venta de los dos solares de Andrea de los Santos a favor de Francisco Rivera, cuyo dinero importe de esas ventas después de descontados 300 y pico de dólares y después de ella pagar los honorarios y los gastos que habían, la diferencia le fué entregada por el mismo Sr. Rivera en mi presencia y en mi oficina a la señora Andrea de los Santos. Ha habido procedimientos contra esa gente, contra ella y contra su hijo y siempre después de eso, se han transado esos asuntos, hasta últi-

mamente cuando no pagaban los intereses ni nada resolvimos proceder a la ejecución. Eso es todo.

"A la corte declara: Que él no contó los últimos dineros esos, pero se los contaron allí en su presencia. En eso no intervino él, pero presenció la entrega.

"A la demandada declara: Que cuando fué esa tarde a pagar a don Martín los $2,300.00 don Martín no se negó a firmar, sino firmó alegando que no estaba completo, pero entonces fué que se hizo la negociación de pagar don Paco la diferencia para que esto quedara saldado; que no recuerda cuál era la diferencia; que Andrea de los Santos no estaba allí cuando se firmó la escritura pero que él tenía la responsabilidad del dinero; que tampoco don Paco Rivera estaba allí; que el testigo fué solo en su automóvil; que no sabe cuándo don Paco pagó la cantidad que hubo que pagarle a don Martín; que don Martín decía que le faltaba algo pero le firmó la escritura; que lo otro, los $40 otros, eso lo arreglaron ellos después; que don Martín firmó por los $2,300 y es de suponerse que don Martín y don Paco arreglaron lo otro después; que no está muy enterado de la cuestión de los $48; que no sabe si don Paco exigió algún documento o lo que sea; que no puede decir qué cantidad exacta le sobró a doña Andrea, él que fué el notario ante quien se otorgó la escritura y que vió contar el dinero de la venta de los dos solares después de descontar la hipoteca de los $300 ni poco más o menos, porque tendría que ponerse a sacar cuenta porque ella tenía que pagar toda la documentación; que es verdad que el testigo es el abogado de Francisco Rivera Collazo, pero que no sabe si él presta dinero a interés usurario; que no es verdad, que él sepa, que el resto de los $700 esos se los quedó como interés usurario don Paco y no le diera nada ante él a doña Andrea.

"Preguntado por el abogado de la demandada a dicho testigo lo siguiente: '¿Por qué si le dió ese dinero ante usted, usted no dió fe en la escritura de ello?' El testigo contestó: 'No tenía que decir eso.'

"Preguntado nuevamente: '¿Es decir, que un notario no tenía que dar fe?'

"Contestación: 'Según como se haga la transacción se hace la escritura.'

"Preguntado nuevamente: '¿Cómo usted siendo un abogado que lleva quince años de práctica, tratándose de una vieja, no hizo todo lo posible por usted y por ella para resguardarse contra estos ataques que surgen ahora?'

"Contestación: 'Precisamente cuando se firmó la escritura llamé a gente como don Pedro Timothee y otro que se me olvidó el nombre, para que fueran ellos los que presenciaran el negocio. Además, que diga la demandada si ella tiene confianza en mí o no.'

"Continúa el testigo declarando a la demandada, que le hizo la siguiente pregunta:

" '¿Por qué desde que se estableció este pleito contra esta señora, ha estado ella a sugerencias de usted, señor testigo, yendo donde usted a transar este pleito, o mandándola donde don Paco y don Paco donde usted, si es una cosa cierta que ella debe esos $2,300 y debe pagarlos, si es una cantidad fija que se debe?'

"Contestación: 'Sencillamente. Doña Andrea ha estado en casa.'

"Otra pregunta, déjeme acabar la pregunta: '¿No es verdad que usted ha estado horrorizado por este negocio y por eso ha estado haciendo ir a la pobre vieja del coro al caño y del caño al coro?'

"Contestación: 'No, señor.'

"La corte pregunta al testigo: '¿Pero la han llamado a esta señora para transar o no?'

"Contestación: 'Esta señora ha estado donde mí para ver de la manera que yo le podía arreglar eso con don Paco y entonces yo la he mandado donde don Paco; que él no la ha mandado a buscar a ella directamente. Yo la demandé a ella y entonces ella ha venido donde mí para que arreglara y la he mandado donde don Paco que es el que tiene que arreglar.' "

En refutación el letrado de la demandada declaró: Que después de radicarse la demanda ella empezó a pedir prórrogas para contestar y el número de éstas se debió al hecho de que el letrado del demandante había dicho al testigo en cierta ocasión en que se vieron: "Mándame a la señora doña Andrea de los Santos a mi oficina, que esto se va a arreglar;" que Andrea de los Santos no le pagaba nada al testigo y a él no le gustaban esos pleitos; que él le sacaba el cuerpo a esas cosas que traen enemistades, pero una vez metido en ella proseguía; que entonces le dijo a su cliente: "Vaya allá" y ella fué; el testigo la mandó a la casa del letrado del demandante. Andrea de los Santos y su hijo Juan también declararon en refutación. Ambos contradijeron de plano al notario en tanto en cuanto el testimonio de éste tiende a demostrar que Andrea de los Santos recibió más de $17.50 en

su presencia. Juan de los Santos corroboró a su madre en todos los puntos esenciales de la declaración de ella.

Después que Rivera fué llamado como testigo de la demandada y de haber repetido su declaración respecto al pago de cierto seguro y sobre la inexistencia de un pagaré en relación con el negocio, tuvo lugar el incidente que a continuación se reseña:

"La demandada le muestra un documento y le pregunta si ésa es la letra del testigo, el que contesta que no es la de él pero es la de su señora, que es lo mismo que si fuera de él; que ese documento se lo dió a doña Andrea el testigo. Y entonces leyendo el documento, que dice:

" 'San Juan, P. R., 22 de junio de 1930.—He recibido de doña Andrea de los Santos la cantidad de sesenta centavos, por concepto de interés de un pagaré. (Firmado) Francisco Rivera.—Son $0.60.', la demandada le pregunta al testigo:

" '¿Por qué, si como usted dice, esto es interés de una cantidad que usted pagó para los seguros de las casas, por qué usted pone "interés"?'

"El testigo contesta: 'Yo le dije que le dí 40 y pico de pesos. Después se le pagó de unas mensualidades que ella había tomado, dos meses que había cogido de garantía en el solar, yo me hice cargo, y después de pagar unos seguros aumentaron a $60 y ella convino en pagar $0.60 de interés y después no me pagó más nada; que por esos $60 no se hizo pagaré.'

"Entonces el abogado de la demandada le pregunta lo siguiente: '¿Y por qué usted en este recibo dice $0.60 importe de un pagaré?'

"La corte entonces dice: 'Aquí se trata de impugnar una escritura pública, y yo estoy aguardando prueba porque tengo ganas de que esto llegue ante mí, un fraude de un notario, para yo hacer un escarmiento grande que sirva de ejemplo a la comunidad y a la profesión de abogado, y quisiera esa prueba de fraude. Vamos al fraude de los $700.'

"Demandada: 'La cuestión es que esta señora, mi cliente, el día 22 de mayo de 1930, hizo varios negocios en la oficina del notario; una hipoteca de $2,300 y otro, una venta de dos solares en $1,012.'

"Entonces la corte pregunta: '¿Y esa cuestión de los $0.60?'

" 'Esos $0.60 . . . Esto para probar que si esa señora se llevó todo ese dinero no hubiera podido coger a este hombre $40 para pagar seguro, etc. etc. Presento como prueba el recibo firmado por

Francisco Rivera de 22 de junio de 1930, un recibo por $0.60 que dice por concepto de interés de un pagaré.'

"El demandante se opone a la admisión de dicho documento por ser inmaterial al caso que se ventila.

"La demandada replica diciendo: 'Que eso se refiere a un pagaré de que ha hablado el propio Francisco Rivera, que le suscribió la demandada en este caso por $40 que tuvo que dar de más para completar la deuda de don Martín Hernández.'

"La corte resuelve la cuestión declarado con lugar la oposición. Entonces la corte resuelve que quede en el récord como prueba ofrecida y no admitida. Tomando la demandada objeción a la negativa de admisión."

Antes de haber ocupado el notario la silla testifical, Rivera había sido llamado nuevamente por el demandante para refutar el testimonio de Andrea de los Santos. Su declaración a este respecto lee así:

" 'Que no es cierto la declaración de doña Andrea de los Santos en la que manifestó que ella no había recibido los $700 y centavos, cobrándose los $300 de la hipoteca constituída a su favor; que la forma en que le hizo entrega de esos $712 fué en billetes americanos contados en el despacho del notario . . . por dicho notario en presencia de los testigos que firmaron; que no es verdad lo que ella dice que el testigo solamente le entregara $17.50, porque después que el testigo le entregó el dinero a . . . (el notario) él no ha tenido más contacto con ella en esa negociación.'

"Vuelto a repreguntar dicho testigo por el abogado de la demandada, declara:

" 'Que no puede decirle cómo es que si él (el testigo) entregó a ella, doña Andrea, en billetes americanos $712, ella tuvo que cogerle a él prestado $40 para completar . . .; que él no tenía que decirle a doña Andrea cuando ella le pidió prestados los $40: "Señora, ¿usted no tiene $712?" Porque una señora que le merece crédito, que está haciendo negocios con él y que es amigo de ella, habiendo sido él consejero de ella, que hasta le proporcionó el dinero para cancelar la hipoteca de Hernández, no iba el testigo estando en esas condiciones, después de haber tenido tantas negociaciones con ella, a preguntarle para qué quería el dinero. Después de eso le ha pedido pequeñas cantidades de dinero.'

"Preguntado el testigo: Si no le llamó la atención de que esa señora, teniendo en su bolsillo $712 le pidiera $40 para ese mismo

negocio, contestó que no fué en ese mismo momento; que se está confundiendo una operación con la otra; que primero se hizo una operación de 1,000 y pico de pesos y después se hizo la otra operación; que la operación de 1,000 y pico de pesos que se hizo aquel día fué la venta de dos solares, la que se hizo antes de la segunda; que la de los dos solares se hizo antes de la hipoteca del Sr. Latoni; que no puede precisar la hora, si fué por la mañana o por la tarde; cree que fué por la tarde.

"Preguntado: '¿Entonces, por qué usted no le dijo a esta señora: Si usted tiene $712, por qué yo tengo que prestarle $40?' Contesta el testigo: 'que el licenciado quiere constituirlo en consejero de ella, cuando él no puede ser consejero de ella; que no se acuerda por cuánto tiempo le prestó el testigo a doña Andrea de los Santos los $40 esos.' "

El juez de distrito, en el curso de su relación del caso y opinión (refiriéndose en la primera oración del extracto, a la defensa afirmativa de la demandada) dijo:

" . . . Para sostener esta alegación, la demandada presentó su único testimonio. Se trata de una mujer de alguna edad, analfabeta, y a la que, según su expresión, 'se le olvidan las cosas.' Hizo gran hincapié y esfuerzos el abogado de la demandada para demostrarnos que la transacción hecha con Rivera Collazo estuvo viciada de fraude y dolo, y que la demandada no recibió dinero alguno por la venta de los solares. En estas condiciones, el propio Rivera Collazo y el testimonio de Rafael Dechoudens contradicen su declaración, manifestando que hubo la entrega del dinero al firmarse la escritura. Pero de toda suerte, cualquiera que haya podido ser la transacción verificada con Rivera Collazo, lo que se cobra en la demanda es el pago de un préstamo en el que el propio notario autorizante, según su declaración, sirvió de portador y entregó el dinero a la parte demandada, conservándolo luego en su poder para cancelar otra hipoteca constituída por esta misma parte. Si bien en la contestación enmendada no se alega de modo expreso el fraude, como la prueba oral practicada ha tendido a demostrarlo, queremos consignar que no es ésa la prueba necesaria para sostener y declarar dolosa o fraudulenta una transacción de esta clase. Si bien el notario autorizante de la escritura manifiesta que la demandada declara haber recibido antes del otorgamiento de la misma la suma de $2,300, es lo cierto que después en su declaración ante nosotros manifestó que presenció la entrega del dinero así como retuvo éste para pagarlo a otro acree-

dor. A esta transacción es a lo que se refiere exclusivamente la demanda. Ya está resuelto que si bien los documentos públicos hacen prueba contra los contratantes y sus causahabientes en cuanto a las declaraciones que en ellos hubiesen hecho los primeros, no obstante tal prueba no es concluyente y puede ser destruída por otra tan robusta y clara que permita al juzgador resolver el conflicto sin vacilaciones de ningún género, toda vez que en caso de duda, la declaración contenida en un instrumento público debe siempre prevalecer. Hernández v. Fernández, 17 D.P.R. 112. No hay duda alguna por nuestra parte de que se otorgó una escritura cuya validez no ha sido impugnada. Andrea de los Santos compareció ante el notario . . ., éste redactó la escritura de acuerdo con los pactos y convenciones que las partes estipularon; leyó la escritura y Andrea de los Santos marcó el original de la escritura, según acredita la copia y firmó por ella el testigo Pedro C. Timothee. Si pudiera desvirtuarse la eficacia de un documento público por una prueba como ésta, en la que al solo testigo de la imputación del fraude 'se le olvidan las cosas', según su frase gráfica, no habría seguridad alguna en la contratación y la fe pública estaría seriamente amenazada de perder su solemnidad. No basta una prueba cualquiera para demostrar que un contrato está teñido de fraude y nulidad; es necesaria una prueba clara, robusta y convincente; y mientras tal prueba no se presente, debemos dar fuerza de credibilidad a la presunción de que la ley ha sido cumplida. Es frecuente en estas personas analfabetas olvidar los actos y contratos que realizan y en más de una ocasión este mismo estado de hechos se nos ha presentado en nuestra práctica; las relaciones de Andrea de los Santos con Francisco Rivera Collazo no tienen conexión alguna con la constitución del crédito que se cobra; fueron operaciones distintas y separadas. En una comparece Francisco Rivera Collazo como apoderado del demandante y en otras comparece en propia persona; aquí estamos resolviendo un pleito de Demetrio Latoni, poderdante de Francisco Rivera, y por la prueba que se nos ofreció y que por no haber sido contradicha con la robustez necesaria debe merecernos entero crédito, se declara con lugar la demanda en todas sus partes.''

La aseveración de que la defensa afirmativa de la demandada está sostenida tan sólo por su testimonio, pasa por alto el hecho de que ella fué corroborada por la declaración de su hijo, Juan de los Santos. Hace caso omiso del hecho incontrovertido de que Andrea de los Santos, al momento de efec-

tuarse las tres transacciones simultáneas, se vió precisada a tomar a préstamo del mandatario y apoderado de Latoni $48 para completar la cantidad requerida para pagarle a Hernández. Resalta el hecho en el presente caso como un obstáculo infranqueable a la confirmación de la sentencia. Aunque es un factor decisivo de acuerdo con nuestro criterio del caso, no permanece solo.

Según la transcripción de autos que tenemos ante nos, Andrea de los Santos no dijo "se le olvidan las cosas". El contexto de la transcripción es "que a ella no se le olvidan las cosas así". No es necesario que nos entreguemos a divagaciones respecto a esta discrepancia. Podría admitirse, y se admite, que la demandada fué correctamente citada por el juez de distrito. La manifestación se hizo en respuesta a una pregunta héchale sobre los detalles de una venta efectuada por la demandada de un solar a un tal Meléndez. No se demostró el tiempo transcurrido desde que se efectuó la venta. Pudo haber sido un año o pudo haber sido una década. La transacción nada tuvo que ver con el presente caso. La significación del incidente para probar su memoria fué demasiado exagerada e indebidamente recalcada a nuestro juicio, por el juez de distrito. Conforme se desprende de los autos, nada hubo en las circunstancias que rodean la venta a Meléndez, calculado para dejar una impresión indeleble en la mente de la vendedora. Su propia explicación espontánea de por qué dejaba de recordar el importe del dinero de la compraventa o cómo fué pagado, siguió inmediatamente a su aseveración de que no recordaba. Esta explicación no era ni irrazonable ni poco satisfactoria. Fué que ella notificó todo a su hija, que era la que llevaba las cuentas. La hija tenía veinte años de edad y asistía a la escuela. Todos recordamos algunas cosas con mucha claridad y otras las olvidamos por completo. Si la experiencia de la demandada con Meléndez hubiese sido enteramente similar a su experiencia con el agente y apoderado de Latoni, su recuerdo de los hechos sobresalientes de la transacción, quizá hubiera sido mucho

más definido. De todos modos su recuerdo de lo sucedido en el presente caso, parece haber sido tan bueno, a decir lo menos, como el de algunos de los testigos del demandante. No nos detendremos a repetir las ocasiones en que esto sucedió. No faltan en la prueba del demandante. Bastará una.

La demandada recordaba que no había pagado las contribuciones. Declaró con bastante franqueza sobre ello al ser repreguntada por el letrado del demandante. No recordaba la suma exacta, mas sí que estaba atrasada al momento de otorgar la hipoteca a Latoni y al vender los dos solares a Rivera. También recordaba que había pagado o autorizado el pago de tales contribuciones para aquel entonces, pero no de los $17.50 recibidos por ella, que eran insuficientes para cubrir la suma debida por concepto de contribuciones. Su recuerdo de esta cuestión está en pleno contraste con el de Rivera al ser preguntado sobre el mismo particular por el abogado de Latoni. Rivera era un hombre de experiencia en los negocios y dedicado activamente a la compraventa e hipoteca de bienes inmuebles. En un período de un año había dado $2,300 de su suegro en préstamo garantizado por hipoteca sobre media docena de solares suburbanos. De ser cierto su testimonio había invertido al mismo tiempo $1,200 de su propio dinero en la compra de otros dos solares, todos ellos pertenecientes a Andrea de los Santos. Sin embargo, este testigo no pudo recordar si Andrea de los Santos había pagado o no las contribuciones atrasadas sobre los dos solares vendídosle y sobre los hipotecados a Latoni.

Es cierto que el testimonio de Andrea de los Santos fué contradicho por el de Rivera, y, hasta cierto punto, por el de Dechoudens y el del notario. Empero, el testimonio de este último, así como el de Dechoudens, no es muy persuasivo, y el de Rivera está directamente contradicho por el del notario.

Dechoudens, según hemos visto, dice que Andrea de los Santos le pagó a Hernández con los $2,300 prestádosle por Rivera, y que él vió el traspaso del dinero. No dice que este

dinero, los $2,300, fué materialmente entregado a Andrea de los Santos y pagado por ella a Hernández, o por ella entregado al notario para que efectuara tal pago. Rivera dice que la demandada tomó el dinero con el propósito de pagarle a Hernández, que se le pagó a éste; que el pago fué efectuado en la oficina del notario. Cuando dice que "Andrea de los Santos tomó ese dinero para pagarle a Hernández" él quiere decir que ella tramitó el préstamo a fin de pagarle a Hernández, no que el dinero fuera realmente entregado a ella. Cuando dice que el pago a Hernández se efectuó en la oficina del notario, él no quiere decir que la misma Andrea de los Santos entregara físicamente el dinero a Hernández en la oficina del notario. Nada hay en el testimonio de estos dos testigos ni en el del notario que demuestre una entrega manual de los $2,300 a Andrea de los Santos. El notario dice, conforme también hemos demostrado, que se le confió la cantidad esa para proceder a la cancelación de la hipoteca de Hernández. No dice que el dinero fué entregado a Andrea de los Santos y entonces puesto por ella en poder de él. Nada hay que demuestre que parte alguna de los $2,300 jamás estuvieran en la posesión material de Andrea de los Santos. El verdadero conflicto en la prueba es qué se hizo o qué se intentó hacer con el producto de la venta efectuada a Rivera.

Dechoudens no declara sobre la entrega del dinero que dice Andrea de los Santos debía recibir como saldo del precio de la venta efectuada a Rivera. Este último manifiesta enfáticamente que los $712 fueron contados y entregados a Andrea de los Santos por el notario en billetes de banco y en presencia de los testigos que firmaron el documento. El notario declara: Que después de deducir los $300 y pico y luego de haber pagado Andrea de los Santos los honorarios del notario y los gastos, el remanente le fué pagado a ella por Rivera, en la oficina del notario y en su presencia; que él no contó el dinero pero que se contó en presencia de él; que no tomó parte en esto pero que presenció la entrega; que no

sabe la cantidad exacta, que Andrea de los Santos tuvo que pagar por toda la documentación; que llamó gente como don Pedro Timothee y otro cuyo nombre ha olvidado para que estuvieran presentes como testigos de la transacción. Parece poco afortunado que luego de tomar la precaución de llamar a personas tales como don Pedro Timothee y otra como testigo, que éstas no fueran presentadas durante el juicio para aclarar discrepancias como la existente entre el testimonio de Rivera y el del notario. De todos modos, el hecho de que Rivera fuera contradicho de plano por el notario sobre la forma en que se contó y pagó el dinero, el hecho de que el notario no participara en contar el dinero y no supiera la suma exacta, y el hecho de que Andrea de los Santos inmediatamente después de esta transacción tuviera necesidad de tomar a préstamo $48 a Rivera para completar la suma exigídale por Hernández, nos convence fuera de toda duda razonable de que Andrea de los Santos y su hijo dijeron la verdad cuando declararon que cuanto ella recibió de esta transacción fué $17.50.

El juez de distrito manifiesta que Andrea de los Santos compareció ante el notario y que éste redactó el documento de acuerdo con los pactos y convenciones que las partes estipularon. El notario dice que la escritura debe hacerse como se haga la transacción. Sin embargo, también expone que no certificó sobre la entrega del dinero en presencia suya por no tener que hacer esto. Si la constancia falsa que aparece en la escritura de enajenación sobre el pago anterior de los $712 a Andrea de los Santos fué puesta siguiendo instrucciones dadas al notario por cualquiera de las partes, Rivera debe ser el responsable de tal constancia. No es probable que Andrea de los Santos diera semejantes instrucciones. Fuera de cualquier cuestión de responsabilidad legal o moral por parte del notario, si se hubieran contado y entregado por Rivera a Andrea de los Santos aproximadamente $700 en presencia del notario, la prudencia y la cautela ordinarias que le indujeron a llamar personas tales como don Pedro Timothee y

otra, debieron haber inducido al notario a cerciorarse de que el documento dijera la verdad sobre esta cuestión. Si no tenía que hacer esto, tenía por lo menos libertad de criterio y no estaba en la obligación de tergiversar los hechos. El haber optado por desvirtuar lo que ahora dice que realmente ocurrió está impugnado por su propio testimonio respecto a cómo debe hacerse constar una transacción en un documento notarial. La contención de Rivera de que él no era abogado de Andrea de los Santos (es decir, si entendemos su punto de vista, que no era el defensor de su hermano) puede o no ser técnicamente correcta. De existir alguna presunción al efecto de que la escritura fué redactada de conformidad con las instrucciones recibidas de una u otra de las partes, no había razón alguna para que la corte, a instancia propia, interpusiera la objeción de que Rivera no podía contestar una pregunta respecto a por qué, si en verdad había entregado a Andrea de los Santos el remanente del precio de la venta en presencia del notario, no se hizo constar ese hecho en la escritura notarial. Si el testigo sabía por qué la escritura dejó de corroborar su testimonio o el del notario, debió habérsele permitido que explicara. Si no lo sabía pudo haberlo dicho así. Sea ello como fuere, debió habérsele permitido contestar la pregunta.

La corte de distrito también dió demasiada importancia al hecho de que Rivera intervino en el negocio de préstamo e hipoteca como agente y apoderado de Latoni y en la enajenación como comprador en su carácter personal. Nada hay que demuestre que él prometiera pagar el resto del dinero de la compraventa en su carácter individual. Por sus términos la escritura no le imponía ninguna obligación de pagar tal saldo en su carácter individual o en alguna otra forma. La escritura decía que ya había pagado el remanente del dinero de la compraventa. Él declaró que había satisfecho el balance del precio en efectivo al realizarse el negocio. No había hecho ni una cosa ni la otra. Según su propia declaración, la venta surgió con motivo de las objeciones puestas por

él a que se tramitara un préstamo, y se efectuó para afrontar y destruir tales objeciones. Según el testimonio de Andrea de los Santos, la promesa de Rivera fué que el resto del dinero de la compraventa sería abonado a la hipoteca. Si Rivera hacía esta promesa en su carácter personal y no como mandatario y apoderado de Latoni, debió haberlo hecho así constar claramente a la anciana e ignorante mujer con que trataba. No lo hizo así. Sólo Latoni o su agente y apoderado pudieron hacer una afirmación semejante a la hecha por Rivera a Andrea de los Santos. No fué una mera promesa de asumir o de pagar parte de la deuda hipotecaria. Fué un entendido de que el resto del dinero de la venta sería abonado a la hipoteca. No hallamos base satisfactoria para la conclusión de que Rivera, al prometerle a Andrea de los Santos que los $700 serían abonados a la hipoteca actuaba en su capacidad individual y no como representante de otras personas.

La teoría de la defensa especial de la demandada no fué que la obligación hipotecaria estaba viciada de fraude o dolo. Esto parece desprenderse con razonable claridad de la contestación misma. Más de una vez durante el juicio el letrado de la demandada hizo constar en términos claros la naturaleza de su defensa. El procedimiento ejecutivo se basó en una cláusula que disponía que al dejar la demandada de pagar tres meses de intereses la hipoteca se consideraría vencida en su totalidad. La demandada declaró que ella no había pagado estos tres plazos porque Rivera no le había abonado intereses sobre los $700 que debían aplicarse a la hipoteca. Ella tal vez pudo exigir que los $700 fueran acreditados *nunc pro tunc* en tal forma que los intereses de los mismos hubieran más que contrarrestado el supuesto incumplimiento y quizá que el pleito fuese desestimado por prematuro. De todos modos, cuanto solicitó fué que se le abonaran debidamente los $700 según Rivera había prometido que se haría, y que se dictara sentencia en su contra por el saldo adeudado a Latoni, con costas y honorarios de abogado

a favor de ella. Tal defensa no puede ser eliminada meramente porque la prueba no establece un caso fuerte de fraude, falsa representación y engaño.

No es necesario que investiguemos la doctrina del caso de *Hernández* v. *Fernández,* 17 D.P.R. 112, citado por el juez de distrito. En ese caso hubo un conflicto de prueba que fué resuelto a favor de la parte demandada por la corte de distrito. Lo que dijimos fué esto:

"En casos de esta naturaleza, la prueba en contrario debe ser perfectamente clara. La misma ley determina que los documentos públicos harán prueba contra los contratantes y sus causahabientes en cuanto a las declaraciones que en ellos hubieran hecho los primeros y para destruir esa prueba se necesita otra muy robusta que permita al juez sentenciador decidir el conflicto sin vacilaciones. En caso de duda se estará siempre a la declaración contenida en la escritura."

En el presente caso no existe conflicto en la prueba respecto a constancia falsa en la escritura de enajenación. Rivera y el notario, al igual que todos los otros testigos cuyos testimonios tienen alguna importancia sobre la cuestión, dicen con entera claridad que Andrea de los Santos no había recibido el saldo del dinero de la venta con anterioridad a la fecha de la enajenación. No hay duda sobre este punto.

El producto de la hipoteca y de la venta a Rivera ascendía a un total en efectivo de algo más de $3,000. De esta suma el notario recibió de Rivera y pagó a Hernández $2,300. De la diferencia ascendente a $712 Andrea de los Santos recibió de Rivera $17.50. El resto, que era poco menos de $700, permaneció en poder de Rivera. Éste dice: Que tenía dinero en el banco y en su casa; que no puede precisar qué cantidad tenía en el banco y qué cantidad tenía en su casa, pero que hay veces que uno cierra con $3,000 y al otro día tiene $3. Es muy cierto, desde luego, que un día una persona puede tener $3,000 en el banco y $3 al siguiente. Es igualmente cierto que uno generalmente tiene talonarios o cheques cancelados. Ora se considere el dinero retenido por

Rivera como el producto de la venta, o como parte del producto de la hipoteca, el resultado es el mismo. Si se le considera como el producto de la venta, debe abonarse a la hipoteca con intereses a razón del 12 por ciento a partir del otorgamiento de la misma. Si se le considera como parte del producto de la hipoteca debe deducirse del principal porque bajo esa teoría Andrea de los Santos nunca recibió tal parte del producto. En uno u otro caso hay razón alguna para que se obligue a Andrea de los Santos a instruir un pleito contra Rivera.

No hay prueba ante nos sobre el importe de los honorarios del notario que éste dice Andrea de los Santos debía pagar. El máximum de tales servicios calculados al amparo de las disposiciones del artículo 2017 de los Estatutos Revisados de 1911, sería $28.09. Deduciendo $712 de esta suma nos queda un remanente de $683.91 para ser abonado a la hipoteca, con intereses a razón del 12 por ciento anual desde el otorgamiento de la misma hasta que se efectuó el pago de los $400. El importe de este abono debe ser $738.63. El saldo adeudado al acreedor hipotecario en enero 24, 1935, sería entonces $1,161.37, en vez de $1,900. *La sentencia debe ser por esta suma con intereses al 12 por ciento en vez de por $1,900 al 12 por ciento. También debe ser sin especial condenación de costas. Se modificará de conformidad, y así modificada, se confirmará.*

El Juez Asociado Señor Wolf disintió.*

El Juez Asociado Señor Córdova Dávila no intervino.